**WILKINSON v. POAG, County Treasurer.**
**No. 5701.**

Court of Appeal of Louisiana.  Second
Circuit.
April 1, 1938.

Oliver & Digby, of Monroe, for appel-
lant.

George Wesley Smith and Fink & Fink, all of Monroe, for appellee.

DREW, Judge.

This is an appeal by P. A. Poag, treasurer of the city of Monroe, from a judgment rendered by the Fourth judicial district court in and for Ouachita parish, La., on a rule nisi ordering a preliminary injunction to issue restraining said treasurer from paying out of the city's funds a voucher which had been issued to the Progress Publishing Company, Inc., for a full-page advertisement of the city of Monroe, La., which appeared in said paper on May 14, 1937.

For a cause of action, the plaintiff herein, L. L. Wilkinson, filed the following petition on February 1, 1938:

"1. That he is a person above the age of 21 years, is a resident of the City of Monroe, and is a taxpayer of the said City and has been for years past.

"2. That he is a resident of the Parish of Ouachita, State of Louisiana.

"3. That he appears herein and files this action solely for the benefit of himself and for the benefit and protection of the other taxpayers of the City of Monroe, who may be similarly situated.

"4. That the City of Monroe is a municipal corporation, situated in the Parish of Ouachita, State of Louisiana, and existing by reason of a legislative charter granted by the Legislature of the State of Louisiana.

"5. That H. H. Benoit is a resident of the said City of Monroe and is Mayor thereof; that C. R. Tidwell is a resident of the said City of Monroe, and is Commissioner of Public Parks and Streets; and that W. D. H. Rodriquez is a resident of the said City of Monroe and is commissioner of Finance and Utilities; and that the said named Mayor and said commissioners constitute the governing authorities of the said municipal corporation of the City of Monroe, Louisiana.

"6. That P. A. Poag is the Treasurer of the said municipality and as such receives and pays out the funds of the said municipality on orders of the said Mayor and said commissioners.

"7. Petitioner now avers that the said governing authorities of the City of Monroe allowed the Progress Publishing Company, Inc., of Hammond, Louisiana, to insert in the Daily Progress, a newspaper published by the said corporation at Hammond, Louisiana, a full-page advertisement of the City of Monroe, for a price and sum of $500.00, insertion of said advertisement being without the authority of law, any contract for such advertisement being ultra vires, and one that the said Mayor and said commissioners are not authorized by the law to make, insertion of the said advertisement for publication not being a municipal function.

"8. Petitioner now files herewith and makes a part and portion of this suit, as if the same were herein fully written, the issue of The Daily Progress, published by the Progress Publishing Company, Inc., of Hammond, Louisiana, on or about the 14th day of May, 1937, which said issue contains the advertisement of the City of Monroe, as well as advertisements of various other cities, bureaus and departments of the State Government of the State of Louisiana.

"9. That insertion of the said advertisement in the said publication called, and calls for, the expenditure of public moneys paid in to the Treasurer of the said City by the taxpayers thereof, and that the expenditure of the said taxpayers' moneys for the use and purposes contemplated by insertion of the said advertisement in the said publication is an unauthorized use and is ultra vires.

"10. Petitioner now avers that the insertion of the said advertisement was not for a public purpose, nor for a municipal purpose, and was therefore illegal and ultra vires.

"11. Petitioner now avers that the said newspaper, The Daily Progress, is a political newspaper, owned mostly by and controlled entirely by the Honorable Richard W. Leche, Governor of the State of Louisiana, who dictates its policies; and in support of this allegation petitioner hereto makes a part and portion hereof, by reference, the published affidavit of ownership made by the owners and publishers of The Daily Progress, as is required by the law.

"12. Petitioner avers that it is currently reported, and generally believed, and therefore, from such information and upon the belief of your petitioner, it is alleged, that the said newspaper, so controlled by the said Richard W. Leche, is used for the advancement of the political destinies of him, the said Richard W. Leche, and of his associates in politics.

"13. That the said newspaper is financed partly by advertisements such as the one inserted by the City of Monroe, inserted by other municipalities throughout the state,

and inserted by persons who have contracts, or who hope to have contracts or deals with the various departments of the state of Louisiana, all of which departments are under control of him, the said Richard W. Leche, who is Governor of the State of Louisiana.

"14. Petitioner now shows that Act No. 47 of 1900 requires that municipalities advertise all contracts in which it proposes to enter, and by which public moneys will be expended, and that such proposed expenditures of moneys by inserting the said advertisement in The Daily Progress was not so advertised.

"15. Petitioner avers that the said Richard W. Leche, using the power of his office, has influenced the insertion of the said advertisements, and in particular the advertisement of the City of Monroe, and that he exercised such influence by directly appealing to the then Mayor of Monroe, at the time the insertion of the said advertisement was authorized in May, 1937, or thereabouts.

"16. Petitioner avers that upon the appointment of H. H. Benoit as Mayor of Monroe by Richard W. Leche, and acceptance of said appointment, the said H. H. Benoit approved for payment, and has ordered the said P. A. Poag, Treasurer, of the City of Monroe, to pay the costs of inserting the advertisement in The Daily Progress, which said costs are illegal, ultra vires, unconstitutional, and the payment of which, having been ordered by H. H. Benoit and approved by C. R. Tidwell, will render irreparable injury to the taxpayers of the City of Monroe and to your petitioner.

"17. Petitioner now shows that the budget of the City of Monroe is today excessive, and that there are not any funds properly available for payment of such ultra vires and illegal contracts, and that the Charter of the City of Monroe, which is hereby specifically plead, and made a part and portion hereof by reference, pledges the revenues of the City of Monroe, to which your petitioner, as a taxpayer, contributes, for Governmental expenses, and that the insertion of the said advertisement is not a governmental function or expense, and is therefore ultra vires and illegal.

"18. Petitioner avers that the said advertisement was and is of no benefit to the City of Monroe, nor to the taxpayers thereof, nor to your petitioner, and that the use of the public moneys to pay for the said advertisement was and is unauthorized and is ultra vires as aforesaid, and is a disguised political contribution.

"19. Petitioner avers that the said Arnold Bernstein has departed this life, and that the Honorable H. H. Benoit has been appointed by the said Governor, Richard W. Leche, as the Mayor of the City of Monroe, and is now acting as such, and that C. R. Tidwell, Commissioner of Public Parks and Streets, was appointed by the said Richard W. Leche, as such commissioner, to succeed the Hon. R. D. Swayze, deceased.

"20. Petitioner avers that recently an order has been issued by the Mayor and by the Commissioner of Public Parks and Streets directing the payment of $500.00 for the said advertisement, and that the Honorable P. A. Poag, Treasurer of the City of Monroe, acting under authority of such order to pay, will pay the said amount, and petitioner avers that said payment, if and when made, will be unlawful, unauthorized, ultra vires, and to the permanent injury of the taxpayers of the City of Monroe, and particularly to your petitioner.

"21. Petitioner further avers that the action of the City of Monroe, in authorizing insertion of the said advertisement in The Daily Progress, and in ordering the cost of the said to be paid, was and is illegal, ultra vires, and unconstitutional, for the following reasons, to-wit:

"(1) That said action is ultra vires of the powers of the Commission Council;

"(2) That the said action, and the attempted action, is in violation of article 4, section 12, of the Constitution of the State of Louisiana;

"(3) That said action is in violation of Section 5, Article 10, of the Constitution of the State of Louisiana; and

"(4) That said expenditure is in violation of City Ordinance No. 2747, for the fiscal year commencing May 1, 1937, and ending April 29, 1938, which Ordinance is specifically plead; and that said expenditure is not included in the budget of expenses for that fiscal year.

"22. Petitioner now shows that said expenditure by the City of Monroe and its officials is unconstitutional, and should any past act of the Legislature attempt to authorize such acts, the same would be unconstitutional for the reason that it would permit public moneys to be used for purposes which are not governmental and are

not municipal, and further, that the expenditure of public moneys in payment of inserting the advertisement of the City of Monroe in The Daily Progress is an expenditure which violates both the Constitution of the State of Louisiana and of the United States of America.

"23. Petitioner now shows that your petitioner, as a taxpayer, and each and every individual taxpayer of the City of Monroe, contributes money to the City of Monroe by taxation to be used for public purposes, and that until the said money so raised is expended, it is his and their private property, and that payment of this money for contracts, expenses or debts, which have not been budgeted, authorized by ordinance or by law, is taking the property of your petitioner, and associate taxpayers, without due process of law, and is, therefore, unconstitutional and contrary to the provisions of the Constitution of the state of Louisana and the United States of America.

"24. Petitioner avers that the said expenditure is not covered by any ordinance; that the said proposed expenditure was not budgeted, and that the said City and its officials had no legal authority to enter into any agreement to advertise the City of Monroe, all in violation of Revised Statute No. 2448, which is hereby, by reference, specifically plead.

"25. Petitioner now avers that Ordinance No. 2747 for the year commencing May 1, 1937, and ending April 29, 1938, was adopted, and advertised according to law, and that the said expenditure of public moneys, as called for by inserting the advertisement of the City of Monroe in The Daily Progress May 14, 1937, was not included in Ordinance No. 2747, and is therefore illegal and ultra vires.

"26. Petitioner further avers that the said P. A. Poag is about to issue the check of the City of Monroe, in the sum of $500.00, to the Progress Publishing Company, Inc., in payment of the said advertisement and that he will issue the said check before a rule for an injunction can be issued and heard, all to the irreparable injury of your petitioner, and other taxpayers similarly situated, and that therefore, in order to protect your petitioner's rights, and the rights of other taxpayers, pending the issuance of an injunction, it is necessary that a restraining order issue, and to the said P. A. Poag directed, enjoining and restraining him from the issuance of the said check in payment of the said bill, until the matter can be heard by the Court on a rule for a preliminary injunction.

"27. Petitioner further avers that the said P. A. Poag is a resident of the City of Monroe and the Parish of Ouachita, and that he is officially Treasurer of the City of Monroe.

"28. Petitioner further avers that he has no adequate remedy at law, and that the payment by P. A. Poag, Treasurer of the City of Monroe, of the said sum of money will work irreparable injury unto petitioner, and the taxpayers of the City of Monroe.

"Wherefore, petitioner prays That the said P. A. Poag, Treasurer of the City of Monroe, be cited in accordance with the law, and served with a certified copy of this petition.

"Further prays that a temporary restraining order do issue, commanding and enjoining and prohibiting the said P. A. Poag, Treasurer of the City of Monroe, from paying to the Progress Publishing Company, Inc., the sum of $500.00 for the insertion of an advertisement in The Daily Progress by the City of Monroe, Louisiana, until a hearing may be had upon petitioner's application for a preliminary injunction.

"Further prays that a day and hour be set, in accordance with the law, in order to hear petitioner's application for such injunction and that upon said hearing, an injunction do issue and to the said P. A. Poag, Treasurer of the City of Monroe, directed, restraining and enjoining and prohibiting him from paying the said amount of money until the trial of this cause may be had upon the merits.

"Further prays that after due and final trial hereof, a permanent injunction do issue, restraining and prohibiting him, the said P. A. Poag, Treasurer of the City of Monroe, from paying to the Progress Publishing Company, Inc., the sum of $500.00 for publishing an advertisement of the City of Monroe in The Daily Progress, as hereinabove set out."

A restraining order was issued, as prayed for, and a rule nisi issued ordering defendant to show cause on February 7, 1938, why a preliminary injunction should not issue pending a final hearing on the application for a permanent injunction.

To said petition, defendant filed exceptions of no cause and no right of action, which were argued and overruled on February 7, 1938. The restraining order was continued in force and the rule refixed for

trial on February 14, 1938. On this date defendant filed an answer reurging his exceptions of no cause and right of action, which answer is as follows:

"Now into Court, in the above styled and numbered cause, comes P. A. Poag, Treasurer of the City of Monroe, who, reserving all of his right under the exception of no cause or right of action heretofore filed and overruled by the court, appears for the limited purpose of answering the rule nisi issued herein and continued and refixed for Monday, February 14, 1938, and answers said rule as follows:

"Appearer reiterates and pleads an exception of no cause and right of action and avers that plaintiff's petition should for said reason be dismissed.

"Further answering, petitioner avers that the City of Monroe is specially authorized by Act No. 8 of the Extra Session of the General Assembly of the State of Louisiana for the year 1928, to advertise by publications and to spend out of its funds, not otherwise specifically allocated by law, a sum of money not exceeding $2500.00, which Act and the authority specially granted to the City of Monroe by said Act is hereby specially pleaded.

"Further answering, respondent avers that the City of Monroe had and does have funds not otherwise specifically allocated by law with which to pay the advertising account to the Progress Publishing Company and that advertising by publications or by radio by the City of Monroe for the fiscal year in which said account was made and out of which it is proposed to be paid does not amount to $2500.00. Respondent further avers that the governing body of the City of Monroe included in its budget for the year beginning May 1, 1937, funds not otherwise allocated by law, out of which to pay advertising done by the City of Monroe during said fiscal year. Respondent further avers that said expenditure is not in violation of Ordinance No. 2747 of the City of Monroe, nor in violence of any ordinance or law relative thereto.

"Respondent specially reserves his right to answer in detail and categorically the allegations of plaintiff's petition in the event that upon the trial of the rule herein, a preliminary injunction should issue and the case be ordered to trial upon its merits, respondent specially restricting the purpose of this answer to the trial of the rule nisi.

"Wherefore, respondent prays that upon trial of the rule herein, there be judgment dissolving and dismissing the preliminary restraining order and refusing a preliminary injunction and otherwise dismissing plaintiff's demand at his cost. Respondent further prays for all general and necessary orders and for equitable relief in the premises."

The trial of the rule was then proceeded with. On the trial defendant again reurged his exceptions of no cause and right of action. At its conclusion the restraining order was continued in effect until February 16, 1938, on which day the lower court rendered judgment ordering a preliminary injunction to issue upon plaintiff furnishing a bond in the sum of $250. The judgment was signed on February 19th, and defendant was granted a devolutive appeal to this court.

The written reasons given for the judgment below are as follows:

"In this case suit is brought by the plaintiff against P. A. Poag, Secretary-Treasurer of the City of Monroe, to enjoin the said Poag from paying the sum of $500.00 to the Louisiana Progress. The testimony of P. A. Poag shows that unless the injunction issues, he will pay immediately the bill in question. His testimony further shows that the payment will be made out of the money or funds budgeted in the City budget, ordinance No. 2747, and out of the actual funds therein budgeted as 'General and Contingent.' It is specially plead by the plaintiff that the payment of this bill by the Secretary-Treasurer will be in violation of law and in violation in particular of City Ordinance No. 2747. The ordinance is introduced and filed in evidence by the plaintiff, being exhibit P-1. The bill in question due the Louisiana Progress, is exhibit P-2.

"As stated above, the testimony of Poag, the Secretary-Treasurer of the City, is to the effect that unless enjoined he will pay this amount and pay it out of the amount budgeted in Ordinance No. 2747 as general and contingent fund under section 1 of said ordinance. Section 7 of said ordinance reads as follows:

" 'Be it further ordained that each administrative department of the City of Monroe, Louisiana, be and the same is hereby authorized and empowered to administer and control its own purchases and expenditures under the authority of the proper official thereof; provided, however, that such purchases and expenditures be within the itemization and allowance of the above and fore-

going budget; and provided further that no general and contingent expense or appropriation shall be extended, included or paid by the City of Monroe, Louisiana, during the period embraced within the above and foregoing budget, other than those general and contingent expenses set forth and provided for therein.'

"There is no contention on the part of the defendant that the expenditure in question, to-wit, the $500.00 for advertising which he seeks to pay the Louisiana Progress, is 'set forth and provided for therein' (Ordinance No. 2747). Furthermore, the defendant frankly states that it is his intention to pay the said bill as a general and contingent expense under the said budget. The court thinks that this is clearly a violation of section 7 of the ordinance, which ordinance is introduced and filed in evidence. There was no sum budgeted in the ordinance for such advertising and, clearly, it was the intention, as set forth in said section 7, to prohibit the City of Monroe and its secretary-treasurer from paying any items as general and contingent expense unless it fell within the category of the general and contingent expenses set forth and provided for in the ordinance. The other grounds urged by plaintiff as to why the payment cannot be made and the injunction should be issued, is that the City does not have any available funds, not otherwise allocated, out of which to pay this debt and that the payment would be contrary to the state law. The state Act in point being No. 8 of the Extra Session of 1928. This act provides that police juries and municipalities serving populations of less than 50,000 shall be permitted to expend not to exceed $2500.00 annually to advertise by publication and radio, provided the funds are not otherwise allocated by law. The act does not define the word 'advertisement'. For the purpose of this decision this court holds that the word 'advertisement' does not include and is not synonymous with the terms 'judicial notice' or 'publication' and therefore expenses by the City for judicial notices or for judicial publication of ordinances, etc., should not be classed as 'advertising.' The plaintiff introduced and filed in evidence certain vouchers showing expenditures already made during the current fiscal year by the City for advertisements. There is no contention that Monroe falls within the classification set forth in Act No. 8 of the Extra Session of 1928 as to the amount fixed, to-wit, $2500.00. The vouchers or exhibits offered by plaintiff to show the expenditures are filed in the record under Nos. P-3 to P-17, inclusive. Also the testimony of Mr. Poag offered by the plaintiff, who called Mr. Poag on cross-examination and the defendant, who had Mr. Poag take the stand in his own behalf.

"The court, in view of the definition heretofore set forth as to what the word 'advertisement' included, has made a careful examination of all of the exhibits so as to separate the sums which can be classed as having been definitely spent for advertising from those sums spent with newspapers in payment of debts incurred for publishing judicial notices and promulgations. The various exhibits are in the record and speak for themselves. After a careful analysis, the court reached the conclusion that out of the sums spent, as set forth in the exhibits, the following are the correct amounts chargeable under the Act of 1928, and $25.00 and $24.00, or $49.00 total; Exhibit P-4, $813.00; Exhibit P-5, $100.00; Exhibit P-6, $314.00; Exhibit P-7, $25.00; Exhibit P-8, $10.00. However, exhibit P-8, although spent for advertising, was not spent to a newspaper and is therefore not chargeable under the Act of 1928, and therefore there should be no charge under exhibit P-8. Exhibit P-9, $15.00; Exhibit P-10, $209.50; Exhibit P-11, $374.50; Exhibit P-12, $15.00; Exhibit P-13, $45.00 (see testimony of Mr. Poag); Exhibit P-14, $10.50; Exhibit P-15, $35.00; Exhibit P-16, $41.50; Exhibit P-17, $15.50, or a total of $2113.50.

"Since the City has spent over $2000.00 for newspaper advertising during the fiscal year, the payment of a newspaper advertisement for $500.00 during this fiscal year would run the amount in excess of $2500.00, the amount to which the City is limited for such an expense by Act 8 of the Extra Session of 1928 and would be in violation of said Act. This is as near as the court can arrive at any accurate figure from a careful examination of the evidence and, in view of the showing made by the introduction of the said evidence at the trial of the rule nisi, and in view of Section 7 and the other sections of ordinance No. 2747, which has been specially plead and is properly before the court, the court thinks it proper to order the issuance of the temporary injunction restraining the payment of the bill in question during the pendency of this suit.

"D. I. Garrett, Judge."

The judgment which was signed includes the reasons for it, but does not include all

the reasons set forth by the lower court in its written opinion. The signed judgment is as follows:

"A temporary restraining order having been issued in the above styled and numbered case without a hearing and a rule nisi having been issued and to P. A. Poag, Treasurer of the City of Monroe, directed and the said rule nisi, or order to show cause, having been duly answered by the defendant and a due trial having been had in open court upon the rule nisi or order to show cause and evidence having been adduced and the law and the evidence being in favor of the plaintiff and against the defendant, it is therefore, by reason thereof, ordered, adjudged and decreed:

"That a preliminary injunction do issue in the above styled and numbered cause upon the plaintiff's executing bond in the sum of $250.00 in the manner and in the form and condition as directed by law, enjoining, restraining and prohibiting him, the said P. A. Poag, Treasurer of the City of Monroe, from paying to the Progress Publishing Company, Inc., during the present fiscal year of the City of Monroe, the sum of $500.00 for an advertisement published in the Progress, a newspaper published at Hammond, Louisiana; the evidence showing that the payment of said $500.00 would exceed the total of $2500.00 which the City of Monroe is authorized to spend for advertising, under Act No. 8 of the Extra Session of the Legislature of Louisiana for the year 1928.

"The said preliminary injunction shall remain in full force and effect during the pendency and until the final trial of the above styled and numbered cause."

We have quoted the pleadings in full for the purpose of showing that when this suit was instituted, the plaintiff was not aware of the existence of Act No. 8 of the Extra Session of 1928 (a fact frankly admitted in argument here), and that the principal, if not the sole, contention of plaintiff at that time was that any act of the city officials of the city of Monroe in contracting for or paying out city funds for advertising purposes was ultra vires of their legal authority and in violation of the Constitution and statutes of the state of Louisiana. After the said act was discovered and specially pleaded in defendant's answer, this contention was abandoned and plaintiff's attack changed to one of attempting to show that the amount of funds expended, including the voucher to the Progress Publishing

Company, Inc., did exceed the amount of $2,500 allowed by said act to be expended during the fiscal year 1937–38. He further contends that section 7 of the Budget Ordinance adopted for that fiscal year specifically prohibited the expenditure of any funds for advertising purposes.

These are now the only two issues contended for by plaintiff and are the two issues upon which the lower court's opinion is based. As we view it, the lower court has passed favorably to plaintiff on both issues in no uncertain terms, and its finding on these issues amounts to a determination of the case upon its merits. State ex rel. Lindsay v. Hemenway Furniture Company, La.App., 159 So. 183, and decisions cited therein.

Section 7 of the Budget Ordinance, which the lower court held to be a bar in payment of the city's indebtedness to the Progress Publishing Company, will be the same on a trial on the merits, and the vouchers, which the lower court found to total in excess of $2,500, likewise will be the same vouchers on a trial on the merits. A trial on the merits will therefore be only a technical, perfunctory proceeding. Due to our conclusions, it is immaterial whether the case is before us on the merits or before us on a devolutive appeal from a judgment granting a preliminary injunction, a suspensive appeal having been refused.

We will first discuss the finding of the lower court on the amounts paid out for advertising by the city of Monroe. The only testimony offered on this issue was that of defendant, supported by the vouchers showing certain funds paid out by the city. Mr. Poag, treasurer of the city of Monroe, the defendant herein, testified on cross-examination by plaintiff and later as a witness for himself. He, if any one, knows exactly what each voucher was issued for. Some of the vouchers covered large amounts which included advertising and other matters not properly classed as advertising, such as publishing of the minutes, etc. In his testimony—which is apparently fair and unbiased—he broke down each voucher and showed exactly what amount was paid for advertisements. He accompanied his testimony with an itemized statement which he had prepared from his records, which shows that, including the contested voucher for $500, the city had only paid out the sum of $2095.25 for advertisements, of the character authorized by Act No. 8 of the Extra Session of 1928. He further testified posi-

tively that the amounts shown on the statement filed by him were all that had been spent or contracted for by the city during the fiscal year 1937–38. The lower court, in its opinion, ignored this testimony and attempted to arrive at the amount expended by the city for advertising purposes by itself breaking down the vouchers.

We have carefully studied the opinion of the lower court on these issues, as well as the vouchers which were before it, and are unable to arrive at the conclusions it did. We are sure that on this issue the vouchers, without explanation, do not support the conclusion reached by the lower court, and that the explanation and breaking down of them by Mr. Poag does clearly show what amounts were paid out for advertising.

■ Our opinion on this issue is that the city of Monroe had expended only $1,595.25, excluding the voucher in contest here, during the fiscal year 1937–38 and to the time of filing of this suit, and that the payment of the voucher made out to the Progress Publishing Company, Inc., when added to the amount already paid out, would not exceed the $2,500 allowed and authorized by Act No. 8 of the Extra Session of 1928. We only pass upon this question because the lower court made it one of its reasons for judgment.

■ Under the facts as alleged by plaintiff and the proof on the trial of the rule nisi, it is clear that at the time the contract was entered into between the city of Monroe and the Progress Publishing Company, Inc., and when the service under said contract was rendered, of date May 14, 1937, no part of the $2,500 allowed by said act had been expended or contracted for. It was the first contract for advertising during the fiscal year 1937–38. It was therefore a legal and binding one at the time it was entered into and at the time the services contracted for were rendered. If at a later date and during the same fiscal year, the city contracted and paid for advertising which consumed all of the $2,500 allowed by law, it cannot affect the contract previously made with the Progress Publishing Company, Inc.

In dealing with this subject, McQuillin, Municipal Corporations, 2d Ed., volume 6, § 2365, has the following to say:

"In some states, including Kentucky, Louisiana, Missouri, Oklahoma, Utah and Wyoming, the constitution or a statute provides that no municipality shall incur indebtedness in any one year in excess of the income and revenue provided for such year, at least without a vote of the people in favor thereof, in addition to a constitutional provision limiting the indebtedness to a certain per cent of the value or assessed value of the property of the municipality. Such a constitutional restriction is also contained in the constitutions of California and Idaho, in which states there is no other fixed debt limit. The purpose of these provisions is to compel municipalities to adopt the safe, sane and conservative plan of pay-as-you-go; and that each year's income and revenue must pay each year's indebtedness and liability, and that no indebtedness or liability incurred in any one year shall be paid out of the income or revenue of any future year. Such a constitutional provision precludes the incurring of further indebtedness for any purpose, including pressing wants, during the current year, after the income and revenues for that year have been exhausted; except that certain indebtedness is sometimes expressly excepted by the constitution from the operation of such a provision.

"If a contract is made at a time when the indebtedness of the municipality is not in excess of its revenues, but thereafter other indebtedness is incurred which exceeds the current revenue, the better rule would seem to be that the earlier contract should be protected, and if the indebtedness created by subsequent contracts is in fact paid so as to exhaust the revenue, the prior creditor, who has done all in his power to protect himself, should not suffer, but that his claim should be enforcible and payable out of future revenues; but this view is not adopted in California where it is held that in such a case the first creditor has no remedy."

The case cited, sustaining what McQuillin says is the better view, is Mountain Grove Bank v. Douglas County, 146 Mo. 42, 55, 56, 47 S.W. 944, 947. In this case the court said:

"As to the second contention, it appears from the report of the referee that, upon the theory that the issuing of the warrant creates the debt, there were warrants for 1888, 1889, and 1890, amounting to $48.85, which were issued before the revenues belonging to the respective classes to which they properly belonged were exhausted; and that, upon the theory that the debts were created when the services were rendered, there were warrants for said years, amounting to $808.77, issued before the revenues belonging to the respective classes to which they belonged

were exhausted. There is no countervailing showing made by the defendant. Under these circumstances, we are not able to see upon what theory the court below refused the seventh instruction asked by plaintiff, to the effect that it was entitled to recover on these warrants. The fact that the money had been paid out upon warrants issued after these does not affect these warrants. It rendered those issued in excess of the sums, respectively, appropriated for the several classes, and in excess of the revenues for that year, void, but it affords no excuse for refusing to pay those that were legal and properly issued. *The second theory upon which the referee stated the account, that the debt was created when the services were rendered or the goods sold and delivered, is the correct statement of the law,* and upon this the plaintiff was entitled to a judgment for $808.77, but not for the $48.85, for that is included in the $808.77, and the circuit court erred in not so finding."

The California case cited by McQuillin, holding to a contrary view, is Weaver v. City & County of San Francisco, 111 Cal. 319, 325, 43 P. 972, 974. The first syllabus of that case correctly reflects its holding, and is as follows:

"Under the provisions of the constitution (article 11, § 18) and of the San Francisco city and county charter (sections 95-98), the board of supervisors are permitted to make expenditures, for purposes other than those enumerated, only from the surplus revenue of the year in which such indebtedness is incurred, and one who becomes a creditor for such purposes must take notice of the limitation, and of the fact that, should the revenues for the current year become exhausted, though by the payment of claims arising after his own, he has no means of obtaining payment."

However, this case was severely criticized in a later decision by the same court, Higgins v. City of San Diego et al., 118 Cal. 524, 532, 50 P. 670, 671. Chief Justice Beatty, in a concurring opinion, had the following to say:

"On a former hearing of this cause the judgment in favor of the city of San Diego was reversed, with directions to the superior court to enter judgment in favor of the water company for the reasonable value of the use of its distributing plant, etc.; said judgment to be made payable only out of the revenues of those fiscal years during which the city held possession of the plant. 45 P. [824] 832. The direction that the judgment should be entered in this specific form was based upon the decision of department 1 of this court in Weaver v. San Francisco, 111 Cal. 319, 43 P. 972, and the apparent acceptance of the doctrine of that case by department 2 in McBean v. City of Fresno, 112 Cal. 159, 44 P. 358 [31 L.R.A. 794, 53 Am.St.Rep. 191]. But both of those cases were decided after the submission of this case, and the question of the form of the judgment had not been raised or argued by counsel for these parties. For that reason a rehearing was granted, in order that the whole matter might be reconsidered in the light of fuller argument before the court in bank should commit itself to a final decision upon a proposition so important in its consequences. What we have to decide is the proper application of section 18 of article 11 of the constitution to a case like this: A city has an income and revenue provided for the ensuing fiscal year amounting to $100,000 over and above all fixed charges, such as salaries of officers established by law. At the beginning of the year it enters into a contract for the construction of some needed public work, and agrees to pay therefor on completion $50,000. The contract is not only valid, but is fair and honest, and has been awarded under open competition to the lowest responsible bidder, at a price which will enable him to make only a reasonable profit. The contractor has done everything that prudence and good faith could possibly demand, and he proceeds at large outlay and expense to the faithful performance of his agreement. But it requires the whole year for the completion of his contract, and, before his claim for compensation can mature or be presented for allowance, the city has entered into other contracts and incurred other liabilities, for which it has expended the whole revenues of the fiscal year, and its treasury is completely bare. Our contractor, under these circumstances, presents his claim, and it is duly allowed; but he can get no warrant from the auditor, and, if he could, the treasurer would not be able to pay it. He sues the city, and there is no defense except that the money which should have been reserved for the payment of his claim has been misappropriated to the payment of claims that were invalid. Must

he then be content with a judgment payable only out of the exhausted revenues of the year in which his contract was made and performed? Must he, in other words, be content to receive nothing merely because the funds to which he was justly entitled have been illegally misapplied?

"The question before us is whether section 18 of article 11 of the constitution leads to such results. That section reads as follows: 'No county, city, town, township, board of education, or school district shall incur any indebtedness or liability, in any manner, or for any purpose, exceeding in any year the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also provision to constitute a sinking fund for the payment of the principal thereof on or before maturity, which shall not exceed forty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void.' The case of Weaver v. San Francisco was not decided exclusively upon this section of the constitution, but was rested, in part at least, upon certain provisions of the charter of San Francisco, which, however, are in the same line and designed to enforce the same policy. Similar provisions of the charter of San Diego have been cited in this case. The meaning of all these provisions in the various municipal charters and in the constitution seems to be too plain for any possible misunderstanding, and is simply this: That a county, city, town, etc., may make valid contracts and incur binding liabilities only to the extent of the revenue provided in advance for their discharge. Such contracts, and such only, are valid; all others are utterly void. Nothing is said as to the application of each year's revenues, but it is plainly implied that they are to be used for the purpose of discharging valid obligations, and must not be misapplied to the payment of invalid claims. Unfortunately, however, the proper course, plainly indicated by the constitution, is not invariably followed. A city, as in the case above supposed, after entering into a valid contract involving a liability not in excess of the revenues provided for its discharge, expends all of its available funds in payment of claims which are of no obligation, because they are based upon subsequent contracts, which are void, for the reason that they involve liabilities which, added to those previously and lawfully incurred, exceed the revenues provided for the year. Such apparently is the case here, and such was the case of Weaver v. San Francisco, in which the court used the following language, which was afterwards quoted approvingly in McBean v. City of Fresno:

"'Whoever deals with a municipality does so with notice of the limitation of its powers, and with notice also that he can receive compensation for his labor and materials only from the revenues and income previously provided for the fiscal year during which his labor and materials are furnished, and with the knowledge, too, that all other persons dealing with the municipality have the same rights to compensation, and are subject to the same limitations, as he is. Even though, at the time of making his contract, there are funds in the treasury sufficient to meet the amount of his claim, he is charged with notice that these funds are liable to be paid out for municipal expenditures before his contract can mature into a claim against the city; and, if others whose claims have accrued subsequent to his are able to intercept these funds, he is in the same condition as any creditor who has dealt with one whose assets are exhausted before he presents his claim. He acquires no claim in the nature of a lien upon these funds for the amount of his demand, nor is there any legal obligation upon the municipality any more than upon any other debtor to pay the claims against it in the order in which they are incurred, unless they are presented in that order, and in such condition and with such formalities as entitle the claimant to immediate payment. In dealing with the municipality, he must rely upon the integrity of its officers that they will not incur any liabilities during the year in excess of the income and revenues provided for that year; and, as a prudent man, he will ascertain, not only the amount of that income, but also the amount of the claims already existing and of those that are likely to be incurred.'

"This language is, in my opinion, too broad and sweeping, and sets forth a doc-

trine which cannot be deduced from the constitution. I concede that one who deals with a city is charged with notice of the limitations upon its powers, and that he can be compensated for his labor and materials only out of the income and revenue previously provided, and also that he must know that all other persons stand upon the same footing; but I cannot admit that he is charged with notice that the city will violate its charter and the constitution by expending the funds properly applicable to the payment of his valid claim in the payment of claims founded on subsequent contracts which are void, for the very reason that the unappropriated revenues of the city are not sufficient to meet them. I do not admit that others, whose claims have accrued subsequently to his, can lawfully intercept any money necessary to discharge his claim. They may do it in fact (as in the Weaver Case), and he may find himself practically in the same 'condition as any creditor who has dealt with one whose assets are exhausted before he presents his claim; but he is in that condition, not because the constitution intended such a result, but only because the city has violated the constitution in misapplying the funds to which he was first entitled. True, he has no lien upon the funds, because they are not under his control; but this is no answer to the justice of his claim, and only makes it more sacredly the duty of the city to protect him in a right which he cannot himself protect. And I insist that there is a legal and constitutional obligation resting upon the municipality different from that which rests upon any other debtor in this respect. An ordinary debtor may incur obligations in excess of his ability to pay, and he may pay them in such order as he chooses. But a city cannot incur valid obligations to pay any more than its revenue already provided will enable it to pay. The moment it oversteps that mark, its contracts cease to be valid, and it cannot pay the claims founded upon such invalid contracts. It is under a legal obligation not to pay them. But its legal and valid obligations—that is to say, all of its obligations first incurred up to the amount of its revenues—it must pay; and as to these, of course, it is a matter of indifference in what order they are paid, if they are all paid in full, as they necessarily must be if no part of the revenues is misapplied, embezzled, or lost. But it is far from being

a matter of indifference if invalid claims founded upon void contracts are paid before valid claims can mature. Nor do I think that one dealing with a municipality must rely upon the integrity of its officers, that they will not incur liabilities during the year in excess of the income and liabilities provided for that year. He has something better to rely upon, viz. this very section of the constitution which we are considering, and which puts it out of the power of the officers to incur any liability in excess of such income and revenues. In entering into any contract, he is bound to ascertain how far the revenues have been appropriated to existing liabilities; but he is not bound to anticipate, and no amount of prudence or foresight could enable him to anticipate, what illegal claims would be incurred by officers willing to violate the city charter and the constitution.

"For these reasons I find myself unable to accept the doctrine of Weaver v. San Francisco, and the conclusion deduced from it, that in cases of this kind the judgment must be made payable only out of the revenues of a particular year or years. I think, on the contrary, that in such actions the sole question is whether there is a valid obligation. If there is, the plaintiff should have judgment in the ordinary form, and there will be no difficulty about paying it if the funds properly applicable to its payment have been neither misapplied, embezzled, or lost. If they have been misapplied, embezzled or lost, the city should not be allowed to allege its own misconduct as a reason for limiting its creditor to a judgment which will be fruitless. In determining the validity of the obligation, it will, of course, always be necessary to inquire whether, at the date of its assumption, there were unappropriated revenues to meet it, because, if there were not, there will be no liability resting upon the city, and the claimant will have no right to a judgment in any form. But if, at the time the contract was made, there were unappropriated revenues to meet it, in whole or in part, the claimant will be entitled to a judgment for the amount of his claim, or such part of it as the funds applicable to its payment will cover.

"If this were a new question, unembarrassed by any previous decisions of the court, the views above expressed would, it seems to me, meet with unhesitating acceptance. But it is not a new question, and was not entirely new when Weaver v. San Fran-

cisco was decided; for in that case the court seems to have felt itself constrained by previous decisions, which were understood as establishing the doctrine there announced. I think, however, that nothing had been previously decided which went to the extent of the Weaver Case, although some of the opinions may contain dicta which point in that direction. The first case in which section 18 of article 11 of the constitution came to be considered was San Francisco Gas Company v. Brickwedel, 62 Cal. 641. That was a proceeding by mandamus against the auditor of San Francisco, to compel him to draw his warrant for the amount of a claim for gas furnished to the city and county. The case does not show in what year the gas was furnished, or out of what year's revenue payment was demanded; nor does it show whether, at the time it was supplied, there were any unappropriated revenues of the current year applicable to the payment. Apparently, however, the case was sent to the superior court, to have these or some of these questions determined; and, in the course of a short opinion stating the reasons for making that order, Judge Ross, referring to section 18 of article 11, said that the framers of the constitution meant that 'each year's income and revenue must pay each year's indebtedness and liability, and that no indebtedness or liability incurred in any one year shall be paid out of the income or revenue of any future year.' So far as we can see from the report of that case, this was mere dictum; but, properly understood, it undoubtedly states the real intention of the framers of the constitution. They did intend that each year's revenue should pay each year's expenses, and that no claims upon one year's revenues should be made a charge upon the revenues of future years.

But how did they propose to accomplish that object? The words of the constitution answer,—by making all obligations contracted in excess of the revenues void and unenforceable, not by making valid obligations unenforceable merely because the city revenues have been exhausted in payment of claims which the constitution declares void. If the behests of the constitution are obeyed in this matter, the object of its framers will be attained, for the extent of a legal obligation of a city is exactly measured by the amount of its revenues; and, if the revenues of one year are properly expended, there can be no valid claim carried over against the revenues of a succeeding year. If, however, the constitution is de-

liberately or recklessly violated, it cannot be a matter of surprise if consequences follow that were not in the contemplation of its framers, and those who have caused the difficulty ought to be the last to complain of it. From what has been said, it is clear that the dictum of Judge Ross in the Brickwedel Case went no further than to declare the true intention of the framers of the constitution. What consequences would follow from disregard of the provision which was designed to carry out that intention was a question not involved in that case, and, of course, not decided. It is further to be observed of this case, as of the cases in which it was followed (Shaw v. Statler, 74 Cal. 258, 15 P. 833; Schwartz v. Wilson, 75 Cal. 502, 17 P. 449; Smith v. Broderick, 107 Cal. [644] 645, 40 P. 1033 [48 Am.St. Rep. 167]; McGowan v. Ford, 107 Cal. 177, 40 P. 231), that they were each and all of them proceedings by mandamus against the auditor or treasurer to compel the drawing or payment of warrants against or out of a particular fund; and the sole question involved was whether it was the legal duty of those officers to pay demands upon the revenues of one fiscal year out of the revenues of another fiscal year. It may be conceded that those decisions have conclusively established the proposition that it is not the legal duty of those officers to make such payment. And the case of Smith v. Broderick, 107 Cal. [644] 645, 40 P. 1033 [48 Am. St.Rep. 167] establishes the further proposition that a consent judgment based upon an illegal demand will not authorize payment out of the proceeds of a special tax levied for the express purpose of paying it. But the question here is whether the holder of a legal and valid claim shall have a plain and ordinary judgment establishing his right. The question whether any means of paying such judgment can be lawfully provided is not necessarily involved, but when that question arises, if it ever does, the case will be widely different from that of Smith v. Broderick. There will be the difference, that is to say, between the effect of a judgment establishing a valid claim which is the result of a bona fide contest in a court of competent jurisdiction, and a mere confession of judgment upon an invalid claim.

"If the views above stated are correct, it has been shown that prior to Weaver v. San Francisco nothing has been decided by this court which sustains the doctrine of that case, and it is not sustained by the constitution. In McBean v. City of Fresno, the question as to the form of judgment in such

cases was not involved, and the opinion in Weaver v. San Francisco was merely quoted arguendo upon another point.

"The case of Bradford v. San Fransisco, 112 Cal. [537] 538, 44 P. 912, was correctly decided, but it has no bearing on this case.

"The result of this discussion is that our former judgment must be modified so far as it directs the future proceedings in the superior court. We cannot direct a superior court to enter a judgment upon the findings for the reasonable value to the city of the use of the water company's plant and of the water supplied, because it does not appear that the claims of the water company all accrued at a time when there were unappropriated revenues to meet them, and it will be necessary for the court to ascertain, as the basis of its judgment against the city, just when the claims of the water company for reasonable value of use, etc., equaled the amount of unappropriated revenues for the respective fiscal years during which the city had the use of the water company's plant. Claims for use of plant and value of water supplied after such times are, like other claims upon exhausted revenues, void, and will not warrant a judgment of any character. We wish also to qualify our former opinion so far as it may seem in any of its expressions to go beyond the decision in McBean v. City of Fresno upon the question of the validity of a contract of a municipal corporation extending over a series of years beyond the term of office of the trustees who authorize it. In all other respects, our former opinion is readopted."

The reasoning in the above opinion, to our minds, completely destroys the finding in the former California case, Weaver v. San Francisco, supra. We therefore accept as a better rule that which is laid down by McQuillin, quoted above.

It therefore follows that when the contract was entered into and the services rendered by the Progress Publishing Company, Inc., there existed a valid, legal obligation, and if the city has surplus funds on hand, the Publishing Company can enforce collection of the debt. If the $2,500 allowed to be expended for advertising has, subsequent to the contract with the Publishing Company, been expended, the debt can still be collected, if there are surplus funds in the city treasury. Any act of the city officials in expending in excess of the $2,000 for advertising purposes after the contract was made with the Publishing Company, if it did, was illegal and can in no way affect it,

and the amount illegally expended can be recovered by the city.

McQuillin, Municipal Corporations, 2 Ed., vol. 5, § 2334, has the following to say:

"One who deals with a municipality is bound by the limitations on its powers, and is chargeable with knowledge thereof. Hence, creditors are chargeable with notice of the restrictions placed on the powers of the municipality as to expenditures and incurring debts, by constitutional provisions, statutes and ordinances.

"The rules are familiar that (1) when the money of a municipality has been paid out on a contract or for an indebtedness which the municipality had no authority to make or incur, it may be recovered; and that (2) where public funds have been unlawfully diverted and can be traced into the property of an insolvent estate they may be reclaimed as a trust fund by the municipality which is the rightful owner, before any distribution is made to the general creditors of the insolvent. Overpayments are not necessarily illegal in the sense that such acts are ultra vires. Such amounts are not always recoverable as wrongful payments on the theory that municipal officers who pay out funds illegally are personally liable with those who receive the moneys. Such payments are distinguishable from those made without authority or in violation of law. If the indebtedness or expenditure is unauthorized, the municipality is ordinarily not liable, in the one case, or can recover back the money paid, in the other. So if bonds have been issued in payment of an unauthorized subscription to the stock of a company, the municipality may recover them. Likewise, where public funds have been unlawfully diverted and can be traced into the property of an insolvent estate, they may be reclaimed as a trust fund by the municipality, before any distribution is made to the general creditors of the insolvent.

"A contract or indebtedness in excess of the debt limit is void, and beyond the aid of a court of equity, and cannot be ratified except by a vote of the people."

The record discloses there is in the city treasury, unexpended or contracted for, allocated in the Budget Ordinance to the "general and contingent" fund, the sum of approximately $6,500. This fund is available to pay the indebtedness to the Publishing Company, unless section 7 of the Budget Ordinance is a bar to it. This section is as follows:

"Be it further ordained, etc., That each administrative department of the City of Monroe, Louisiana, be and the same is hereby authorized and empowered to administer and control its own purchases and expenditures under the authority of the proper officials thereof; provided however, that such purchases and expenditures be within the itemization and allowance of the above and foregoing budget; and provided further, that no general or contingent expenses or appropriations shall be expended, incurred or paid by the City of Monroe during the period embraced within the above and foregoing budget, other than those general and contingent expenses set forth and provided for therein."

The Budget Ordinance sets forth the amount to be expended by each individual department, such as Fire Department, Charity and Relief, Engineering Department, Sewerage, etc. It provides so much for the Health Unit; so much for Donations, etc., not itemized in any respect. It also provides under "general and contingent" the sum of $25,230. Nothing is itemized thereunder any more than is itemized under the other Units and Departments. It also contains the following entries:

| | |
|---|---|
| Notes payable | $35,553.04 |
| Interest | 5,000.00 |
| Accounts payable | 60,000.00 |

and many other such items. According to our understanding of the definition of "itemization," if section 7 of the ordinance were given the meaning and interpretation contended for by plaintiff, then every dollar of the $922,000 paid out by the city or any of its departments during this fiscal year was illegally expended. That, of course, was not done. Section 7 of the ordinance is divided into two separate parts. The first deals with the amount each administrative department of the city shall spend, and the second part concerns what the city, meaning the mayor and commissoners acting in concert, shall spend. That which the mayor and commissioners shall spend, acting as the governing body of the city, is the amount necessary to take care of incidentals and contingencies that may arise during the year which, in their discretion, are in the interest of and for the welfare of the city, and were not known at the time the budget was prepared and enacted into an ordinance. For that purpose, a "contingent" fund is also provided in the budget, and what the second part of section 7 means is that the city shall not exceed for incidentals or contingencies that may arise during the year, any more than the amount allocated in the budget for that purpose.

Every section of every act or ordinance should be given a meaning, if possible, and if the above interpretation of it is not correct, this section is meaningless. We think its meaning is clear. If the $25,230 allocated to the "general and contingent" fund was not put in the budget to be used for incidental and contingent expenses, why was it placed there? If not for this purpose, it would have been deposited in a sinking fund. It was clearly intended to be used for the purpose for which it has been expended, for nowhere else in the Budget Ordinance is there any provision made for payment of incidentals or contingencies. That the advertising of the city, such as was done in this case, clearly falls within the purpose provided for by a "contingent" fund, we have to look no farther than McQuillin, Municipal Corporations, 2 Ed., vol. 5, § 2338. Also see Mitchell v. City of Saint Paul, 114 Minn. 141, 130 N.W. 66.

We therefore find that plaintiff has failed to make a showing either in fact or law which justified the lower court in ordering the preliminary injunction to issue herein; and that the judgment of the lower court in ordering a preliminary injunction to issue was erroneous and it is now reversed. However, there are other reasons why the preliminary injunction should not have been issued, and the first is that the exception of no right of action should have been sustained. This exception was urged in limine litis. It was urged in answer to the rule nisi, re-urged on the trial of said rule, and is seriously urged here.

We have to begin with a valid, legal, and binding contract between the city of Monroe and the Progress Publishing Company, Inc., whereby the city agreed to pay to the said Publishing Company $500 for a full-page advertisement in its paper. The services were rendered satisfactorily by the Publishing Company. In compliance with said contract, a voucher against the "contingent" fund provided for in the Budget Ordinance was prepared by the treasurer of the city, purely a ministerial officer. Before the voucher could be delivered and paid, plaintiff herein brought this suit against the treasurer, restraining him from using or paying the voucher. Neither of the contracting parties, the city of Monroe nor the Publishing Company, is made a party to the suit. Although the effect of the present

suit, if successful, would be to annul a legal and binding contract which has been fully executed, neither has been made a party to it. Plaintiff is clearly without right in law to such an action.

In the case of Dunham v. Town of Slidell, 133 La. 212, 62 So. 635, 636, the court said:

"There can be no dispute but that the municipalities of the state are prohibited from contracting debts without having made provision for their payment.

"Oubre v. Donaldsonville, 33 La.Ann. 386; Snelling v. Joffrion, 42 La.Ann. 886, 8 So. 609; Bank v. Town of Jennings, 107 La. 547, 32 So. 66; Blanks v. Town of Monroe, 110 La. 944, 34 So. 921.

"And there can be no dispute that if a municipality attempts to do so, an injunction will lie at the suit of one or more of its taxpayers.

"Handy v. City of New Orleans, 39 La. Ann. [107] 109, 1 So. 593; City-Item Co. v. City of New Orleans, 51 La.Ann. 713, 25 So. 313; Hudson v. Police Jury, 107 La. 387, 31 So. 868; Sugar v. Monroe, 108 La. 677, 32 So. 961, 59 L.R.A. 723.

"But an injunction will not lie to enjoin the doing of a thing already done.

"Trevigne v. School Board, 31 La.Ann. 105; Callan v. Board, 45 La.Ann. 673, 12 So. 834.

"The injunction asked for in the present case could therefore issue only to prevent the further carrying out of the ordinance in question; that is to say, against any purchases being made, in case none had yet been made, and against the payment of whatever part of the purchase price yet remained unpaid, in case the purchase had already been made and a part of the price had already been paid.

"In so far as seeking to enjoin the further execution of the contract, however, the suit would be one to annul the contract; and it stands to reason that to such a suit all parties to the contract would have to be made parties.

"22 Cyc. 912; 28 Cyc. 1746; Willis v. Wasey, 42 La.Ann. 876, 8 So. 591, 879, and authorities there cited; Theriot v. Daigle, 125 La. 363, 51 So. 292.

"In the 'absence of these parties, therefore, the injunction can issue only to prevent the execution of the ordinance in case the contract it authorizes has not yet been entered into."

■ Furthermore, we might add that the taxes for this fiscal year have been collected and out of the amount there is in the city treasury, not allocated to any other fund or purpose, many times more than enough to pay the voucher to the Progress Publishing Company, Inc. The payment of this voucher will not and cannot cost any taxpayer of the City one penny. Although plaintiff alleged himself to be a taxpayer, there is no evidence in the record to show it. But, assuming he is, the payment of the $500 will not cause him to pay one cent more than he has already paid, and certainly he cannot recover from the city any part of the taxes he has paid. Therefore, by no stretch of the imagination can we see where any injury, irreparable or otherwise, can be inflicted upon him by the City paying the obligation, legally made, and having received any and all benefits that might have come from it. Plaintiff is clearly without interest in this suit and without a right of action to enjoin the treasurer of the city of Monroe from performing a ministerial duty which can in no way cause him any injury or damage.

■ The mayor and commissioners of the city of Monroe are the administrative officers of that city and, in exercising their administrative duties, it becomes necessary in many instances for them to use their sound discretion. For example, if in deciding how and where they will spend all or part of the $2,500 allowed by law to be used for advertising the city, they determine it is to the city's best interest to use some particular publication, it does not behoove any taxpayer, who disagrees with their selection, to interfere. So long as they use their discretionary administrative powers within the limits fixed by law, no taxpayer has the legal right to enjoin their action by legal process, because he disapproves of how the money is being spent. No court should be called upon to act as arbiter of political differences between persons or different factions, except in those cases positively directed by law, and we have repeatedly refused to act as such. Political differences should be settled at the polls and not in courts.

We are convinced there is no merit in this case and that the law and facts, as fully discussed heretofore, do not warrant the issuance of a preliminary injunction and that plaintiff is without a right of action.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court ordering a preliminary injunction to issue herein is reversed; the order for the in-

junction is recalled; the exception of no right of action filed by defendant is sustained and plaintiff's suit is dismissed· at his costs, in both courts.